UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
SECURITIES AND EXCHANGE                   )
COMMISSION,                               )
                                          )
                    Plaintiff,            )        Civil Action No. 12-10643-GAO
                                          )
           v.                             )
                                          )
AUTOCHINA INTERNATIONAL LIMITED,          )        JURY TRIAL DEMANDED
HUI KAI YAN,                              )
RUI GE DONG,                              )
VICTORY FIRST LIMITED,                    )
RAINBOW YIELD LIMITED,                    )
YONG QI LI,                               )
AI XI JI,                                 )
YE WANG,                                  )
ZHONG WEN ZHANG,                          )
LI XIN MA,                                )
YONG LI LI,  and                          )
SHU LING LI,                              )
                    Defendants,           )
_____)

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants AutoChina International Limited ("AutoChina"), Hui Kai Yan, Rui Ge Dong,

Victory First Limited ("Victory First"), Rainbow Yield Limited ("Rainbow Yield"), Yong Qi Li,

Ai Xi Ji, Ye Wang, Zhong Wen Zhang, Li Xin Ma, Yong Li Li, and Shu Ling Li (collectively,

"Defendants"):

## SUMMARY

1.      AutoChina is a company based in the People's Republic of China whose stock is

registered with the Commission and trades in the United States.  In late 2010, AutoChina and the

other Defendants engaged in a manipulative scheme by artificially boosting the trading volume

of AutoChina's stock.  This scheme was designed to create the appearance of liquidity of AutoChina's publicly traded stock, enhancing the company's ability to get much-needed financing.  During the course of this scheme, Massachusetts investors purchased AutoChina stock.

2.      For example, AutoChina negotiated with potential lenders for a loan to its Chairman to be secured by AutoChina stock owned by the Chairman through an entity he controls.  But the efforts failed.  Potential lenders were leery about extending sufficient credit because AutoChina's stock didn't trade often or broadly enough.

3.      Beginning in or about October 2010, the Defendants and others opened 26 brokerage accounts at E*Trade Financial Corporation ("E*Trade") (collectively, the "E*Trade Accounts").  The Defendants and others deposited more than $60 million into the E*Trade accounts over four months, and from October 2010 through February 2012, bought and sold millions of shares of AutoChina stock through these accounts.  They traded only in AutoChina stock.

4.      Many of the E*Trade Accounts were opened on the same day, or within days of each other.  Many of the applications listed AutoChina as the applicant's employer, or provided AutoChina's address as a mailing address.  Also, many of the applications for the E*Trade Accounts listed the same building as either a mailing or a home address.  Though the Defendants and others deposited more than $60 million into the E*Trade Accounts, the account applications listed annual incomes of only $15,000 to $99,999.  The size of the deposits to the Defendants' accounts, and the volume of their trading, was well beyond what their self-described means (as set out on their E*Trade Account applications) would indicate was possible for them.  For example, among the E*Trade Account-holders was a 27-year-old "actress," Ye Wang, whose

account-opening application showed her as the sole owner of Defendant Victory First.  Together, Victory First's and Wang's accounts were funded with over $15 million.

5.      Defendants AutoChina, Rui Ge Dong,  Rainbow Yield, Yong Qi Li, Ai Xi Ji, Zhong Wen Zhang, Li Xin Ma, Yong Li Li, and Shu Ling Li also maintained brokerage accounts at Polaris Securities (Hong Kong) Limited ("Polaris").  The Polaris accounts traded nearly exclusively in AutoChina securities.

6.      Through their E*Trade Accounts and their Polaris accounts, the Defendants aggressively bought and sold AutoChina's stock to create the false appearance of a liquid market and stable price for the stock.  The Defendants placed matched orders, as well as wash trades and other non-economic trades, creating an appearance of an active market for AutoChina shares, increasing sales volume, and supporting the price of the stock.

7.      Many of the trades in different Defendants' accounts were made from the same computer network, or even the same computer.

8.      Average daily trading volume increased dramatically as a result of the manipulative trading.  Between June and October 31, 2010 (prior to the opening of all but one of the E*Trade Accounts), the average daily trading volume for AutoChina stock was approximately 18,000 shares per day.  During the period November 1, 2010, through January 31, 2011, the average daily trading volume increased to over 139,000 shares per day.  During this period, Massachusetts investors traded AutoChina stock.  On some days, trades made by the E*Trade Accounts, including those owned by the Defendants, accounted for more than 70% of the market in AutoChina stock.

9.      Near the end of this period, in or about February 2011, an entity controlled by AutoChina's Chairman and his spouse obtained approximately $120 million in financing.  That

entity's only asset was AutoChina stock.  The entity subsequently transferred at least $60 million of the loan proceeds to AutoChina.

10.     By engaging in the conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Defendants Rui Ge Dong, Victory First, Rainbow Yield, Yong Qi Li, Ai Xi Ji, Ye Wang, Zhong Wen Zhang, Li Xin Ma, Yong Li Li, and Shu Ling Li aided and abetted AutoChina's violation of Section 17(a) of the Securities Act and Sections 9(a) and 10(b) of the Exchange Act and Rule 10b-5 thereunder.

11.     Based on these violations, the Commission seeks:  (1) entry of a permanent injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest; (3) the imposition of a civil monetary penalty due to the egregious nature of Defendants' violations; (4) the imposition of an officer and director bar against defendant Hui Kai Yan; and (5) such other and further relief as the Court deems just and proper.

## **JURISDICTION AND VENUE**

12.     The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

13.     This Court has jurisdiction over this action pursuant to Sections 20(b) and (d) and 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a),77v(c)]  and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

14.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa], because certain of the

transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of Massachusetts. Massachusetts investors bought and sold AutoChina stock during the period of manipulative trading.

15.     In connection with the conduct alleged in this Complaint, the Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

16.     The Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

17.     Unless enjoined, the Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

18.     AutoChina is a Cayman Islands corporation located in the People's Republic of China. AutoChina is a foreign private issuer that files Forms 20-F with the Commission as its annual report. AutoChina was listed on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "AUTC" until October 4, 2011, after which its listing was suspended for failing to be current in its filing requirements with the Commission. AutoChina is currently quoted on the OTC Link under the symbol "AUTCF.PK." AutoChina is a holding company whose only business operations are conducted through its wholly owned subsidiaries AutoChina Group Inc. and Fancy Think Limited. The company owns and operates a commercial vehicle leasing business in China.

19.     Hui Kai Yan, age 47, is AutoChina's Secretary and a member of the AutoChina Board of Directors. He is a Chinese citizen and resides in Shijiazhuang, Hebei, China.

20.     Rui Ge Dong, age 43, is a Chinese citizen and resides in Shijiazhuang, Hebei, China.

21.     Ye Wang, age 28, is the Signatory, sole Director, and sole shareholder of defendant Victory First. She resides in Zhang, Hebei, China.

22.     Yong Qi Li, age 56, is a Manager at Beijing Ching Hun Chang located at Yuan Shi County, Shijiazhuang, Hebei, China. He is a Chinese citizen and resides in Shijiazhuang, Hebei, China.

23.     Ai Xi Ji, age 57, is a Chinese citizen and resides in Shijiazhuang, Hebei, China. On information and belief, Ai Xi Ji is married to Yong Qi Li.

24.     Zhong Wen Zhang, age 52, is a Chinese citizen and resides in Shijiazhuang, Hebei, China.

25.     Li Xin Ma, age 45, is a manager at Shijiazhuang Kaiyuan Auto, a subsidiary of AutoChina. She is a Chinese citizen and resides in Shijiazhuang, Hebei, China.

26.     Yong Li Li, age 46, is an engineer at Rui Da Project Construction Co. He is a Chinese citizen and resides in Shijiazhuang, Hebei, China.

27.     Shu Ling Li, age 40, is a former manager at AutoChina as well as the sole Director of Rainbow Yield. She is a Chinese citizen and resides in Shijiazhuang, Hebei, China.

28.     Victory First is a foreign entity with a registered address of 3rd Floor, Omar Hodger Building, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands. Ye Wang is the Signatory, sole Director and sole shareholder of Victory First.

29.     Rainbow Yield is a foreign entity with a registered address of 2nd Floor, Abbott Building, Road Town, Tortola, British Virgin Islands. Signatories on its E*Trade Application

are Hui Kai Yan, Manager and Secretary for the Board of Directors at AutoChina, and Shu Ling

Li, the Chairman's sister and former AutoChina employee.

## FACTUAL ALLEGATIONS

**A. AutoChina seeks liquidity of publicly traded stock.**

30.     AutoChina's business requires external financing for the business to grow.  The

low liquidity of AutoChina's publicly traded stock negatively affected its efforts to secure

financing.

31.     For example, beginning no later than August 2009, AutoChina was engaged in

ongoing efforts to obtain financing from various lenders.  Some of those efforts focused on a

loan that would be made to AutoChina's Chairman (who would subsequently lend the money to

AutoChina), with AutoChina stock owned by the Chairman serving as collateral for the loan (a

"share-backed" loan).  Acting through the Chairman, Hui Kai Yan, AutoChina's Chief Financial

Officer ("CFO") and others, AutoChina sought to borrow more than $90 million**.**  However,

from August 2009 through January 2011, no share-backed loan was consummated.

32.     Potential lenders expressed concerns to AutoChina that the low trading volume of

AutoChina's stock would not support a share-backed loan.  For example, in August 2009, one

possible lender indicated that the volume of the stock was too low for it to provide adequate

collateral for the loan.  In November 2009, another potential lender indicated that, given the

stock's low liquidity, it was unlikely that lender would provide a loan.  A third lender made a

similar comment in February 2010.

33.     In or about October 2010, AutoChina contacted a number of new potential lenders

about a possible share-backed loan.  Lenders continued to express concerns about trading volume

and were hesitant to extend the requested loans.

34.     In weekly status reports, the CFO updated the Chairman, Yan and others about the status of AutoChina's financing efforts.  In one such report, during October 2010, the CFO indicated that one potential lender had determined not to extend the loan because of low trading volume in AutoChina's stock.

**B.  Opening the E*Trade Accounts.**

35.     During this same time period, in or about late October and November 2010, the 26 E*Trade Accounts were opened by people with some relationship to AutoChina or each other. Some did business with AutoChina.  Others, according to account-opening documents, were employed by AutoChina, were related to people employed by AutoChina, identified AutoChina's business address as an address on account-opening documentation, and/or reside in the same building with each other.  AutoChina Secretary Hui Kai Yan advised AutoChina officers, employees, and other shareholders who wished to trade in AutoChina stock to open accounts at both Polaris and E*Trade and helped them to do so.

36.     The E*Trade account-opening documents list annual incomes of less than $100,000, and no individual claimed to have a liquid net worth of more than $999,999. Nonetheless, these accounts were funded with approximately $60 million from approximately November 2010 through February 2011.

37.     The E*Trade Accounts subsequently traded solely in AutoChina stock, using limit orders (orders to buy or sell at a specified price) rather than market orders.  The Defendants held 11of the 26 E*Trade Accounts.

38.     With the exception of the company accounts, all of the E*Trade Accounts were opened as individual accounts with no co-holder listed.  Each applicant listed only him- or herself as the beneficial owner of the account.

### C.   The Defendants are Connected to AutoChina.

39.      The Defendants' connections to each other and to AutoChina are revealed by their E*Trade account-opening forms, by their other brokerage accounts, and by their holding of stock options and warrants issued by AutoChina through a series of private stock transactions.  These connections are described below and set out in Table 1.  In addition, the Defendants traded solely in AutoChina stock through the E*Trade Accounts.

40.      Rui Ge Dong opened an E*Trade Account on or about November 8, 2010.  She also had an account at Polaris.  Her employer was listed as "AutoChina" on the E*Trade account-opening documents and she provided a mailing address of 216 Hong Qi St.  She listed an annual income of $50,000 to $99,999.  Her E*Trade account was funded with approximately $14.8 million.

41.      Victory First opened an E*Trade Account on or about November 11, 2010.  Victory First's account-opening records listed Ye Wang as both the primary account holder and the sole beneficial owner.  The same account-opening documentation identifies Ye Wang as a 27-year-old actress.  The Victory First account was funded with approximately $11.8 million.

42.      In or about April 2010, AutoChina transferred approximately $2 million to Victory First pursuant to a purported currency exchange agreement.

43.      Ye Wang, the primary account holder and sole beneficiary of Victory First, opened an individual E*Trade Account on or about October 13, 2010.  She listed an annual income of $15,000 to $24,999 .  Her account was funded with approximately $3.7 million.

44.      Rainbow Yield opened an E*Trade Account on or about November 17, 2010.  It also had a Polaris account.  The E*Trade account was funded with approximately $7 million.  At

the time the account was opened, Shu Ling Li was the sole director of Rainbow Yield.  Shu Ling Li is the sister of AutoChina's Chairman.

45.     Hui Kai Yan had signatory authority over Rainbow Yield's E*Trade account and Yan was the person responsible for signing the account-opening documents on Rainbow Yield's behalf.

46.     In or about June 2010, AutoChina transferred approximately $18 million to Rainbow Yield pursuant to a purported currency exchange agreement.  In or about January 2011, an account in Rainbow Yield's name transferred approximately $800,000 to AutoChina's U.S. offices purportedly for operating expenses.  Defendant Hui Kai Yan was involved in the transaction.  On or about November 30, 2011, AutoChina filed its Form 20-F with the Commission for the period ending December 31, 2010, for the first time publicly acknowledging Rainbow Yield as an "affiliate."

47.     Yong Qi Li opened an E*Trade Account on or about November 9, 2010.  He also had a Polaris account.  His E*Trade account-opening forms reflected a home and mailing address of 216 Hong Qi St.  He listed an annual income of $50,000 to $99,999.  His E*Trade account was funded with over $6.2 million.  Yong Qi Li is a brother of AutoChina's Chairman.

48.     Ai Xi Ji opened an E*Trade Account on or about November 9, 2010.  She also had a Polaris account.  On the E*Trade account-opening documents, she listed AutoChina as her employer and gave a home and mailing address of 216 Hong Qi St.  She listed an annual income of $50,000 to $99,999.  Her account was funded with over $3.8 million.  On information and belief, Ai Xi Ji is married to Yong Qi Li.  Therefore, on information and belief, Ai Xi Li is the sister-in-law of AutoChina's Chairman.

49.     Zhong Wen Zhang opened an E*Trade Account on or about November 9, 2010. He also had a Polaris account.   On the E*Trade account-opening documents, he listed AutoChina as his employer and gave a home and mailing address of 216 Hong Qi St.  He listed an annual income of $50,000 to $99,999.  His E*Trade account was funded with approximately $3.1 million.

50.     Li Xin Ma opened an E*Trade Account on or about November 10, 2010.  She also had a Polaris account.  On her E*Trade account-opening documents, she listed AutoChina as her employer and gave a home and mailing address of 216 Hong Qi St.  She listed an annual income of $50,000 to $99,999.  Her E*Trade account was funded with approximately $1.4 million.

51.     Hui Kai Yan opened an E*Trade Account on or about November 8, 2010.  He also had a Polaris account.  On the E*Trade account-opening documents, he listed AutoChina as his employer and gave the AutoChina offices as his mailing address.  He listed an annual income of $50,000 to $99,999.  His E*Trade account was funded with approximately $1.1 million.

52.     Yong Li Li opened an E*Trade Account on or about November 9, 2010.  He also had a Polaris Account.  Yong Li Li is a brother of AutoChina's Chairman.  On his E*Trade account-opening documents, he listed a mailing address of 216 Hong Qi St.  He listed an annual income of $25,000 to $49,999.  His E*Trade account was funded with approximately $1million.

53.     Shu Ling Li opened an E*Trade Account on or about November 8, 2010.  She also had a Polaris account.  Shu Ling Li is a sister of AutoChina's Chairman.  Her E*Trade account-opening documents list a mailing address of AutoChina's offices, and show AutoChina as her employer.  She listed an annual income of $50,000 to $99,999.  Her E*Trade account was funded with over $700,000.

54.     Nine of the Defendants (Rui Ge Dong, Victory First, Yong Qi Li, Ai Xi Ji, Zhong Wen Zhang, Li Xin Ma, Hui Kai Yan, Yong Li Li, and Shu Ling Li) opened their E*Trade Accounts between November 8 and November 11, 2010.  Eleven of the other 26 E*Trade Accounts were also opened during this four-day period.

55.     Six of the Defendants (Rui Ge Dong, Yong Qi Li, Ai Xi Li, Zhong Wen Zhang, Li Xin Ma, and Yong Li Li) listed the same address, 216 Hong Qi Street, as either their home or mailing address on the E*Trade account opening documents.  Five of the other 26 E*Trade Account-holders also listed this address on their account opening documents.

56.     Two of the Defendants (Hui Kai Yan and Shu Ling Li) listed the AutoChina offices as a mailing address on their E*Trade account opening documents.  Seven of the 26 other E*Trade Account-holders also listed AutoChina's offices as a mailing address on their account opening documents.

57.     Six of the Defendants (Rui Ge Dong, Ai Xi Ji, Zhong Wen Zhang, Li Xin Ma, Hui Kai Yan, and Shu Ling Li) listed their employer as AutoChina on their E*Trade account-opening documents.  Of these six, AutoChina has acknowledged that two (Hui Kai Yan and Shu Ling Li) were current or former employees.  Eight of the other 26 E*Trade Account-holders also listed their employer as AutoChina on their account opening documents.  Of these eight, AutoChina has acknowledged that five were current or former employees.

58.     In addition to opening the E*Trade Accounts, 19 of the 26 E*Trade Account-holders also had brokerage accounts at Polaris Securities (Hong Kong).  The majority of the Polaris accounts appear to have been opened on the same day (May 9, 2009).  The Defendants held nine of these Polaris accounts.

59.     Another connection between several of the E*Trade Account-holders and AutoChina is revealed through a series of private stock transactions, as disclosed by AutoChina on its 2009 Form 20-F filed with the Commission.  That filing lists the following Defendants as having received stock options and warrants in the Company: Rui Ge Dong, Rainbow Yield, Yong Qi Li, Ai Xi Ji, Zhong Wen Zhang, Li Xin Ma, Hui Kai Yan, Yong Li Li, and Shu Ling Li. Thus, beginning no later than 2009, AutoChina had a prior relationship with these Defendants.

60.     Some or all of the stock described in the prior paragraph was restricted stock.

61.     Many of the Defendants sold millions of dollars' worth of restricted shares of AutoChina stock in or about December 2010, during the period of the Defendants' heavy trading in AutoChina stock.  The restricted stock was held in these Defendants' brokerage accounts at Polaris.  At or around the time of these restricted stock sales, the Defendants transferred millions of dollars from their Polaris Account to their  E*Trade Accounts.  After selling the restricted stcok through Polaris, the Defendants subsequently bought additional AutoChina stock through E*Trade.

62.     For example, on or about December 14, 2010, Yong Li Li sold 25,000 shares of restricted stock for $25.00 per share, for total proceeds in excess of $600,000.  Shortly thereafter, Yong Li Li transferred more than $600,000 to his E*Trade account, which was reflected as available cash as of December 20, 2010.  On that day, Yong Li Li purchased 40,000 shares of AUTC stock, again for $25.00 per share.

63.     The following table depicts these connections.

| Table 1. Defendants' Connections | | | Information per E*Trade Application Forms | | | | |
|---|---|---|---|---|---|---|---|
| Account Name | Polaris Account | Options / Warrants | Employer | Opening Date | Annual Income | Home Address | Mailing Address |
| **Proposed Defendants** | | | | | | | |
| Rui Ge Dong | X | X | AutoChina | 11/8/2010 | $50 - 99k | | 216 Hong Qi St (A) |
| Victory First Limited | | | | 11/11/2010 | $100 - 199k | | |
| Rainbow Yield Limited | X | X | | 11/17/2010 | $50 - 99k | | |
| Yong Qi Li | X | X | | 11/9/2010 | $50 - 99k | 216 Hong Qi St | 216 Hong Qi St |
| Ai Xi Ji | X | X | AutoChina | 11/9/2010 | $50 - 99k | 216 Hong Qi St | 216 Hong Qi St |
| Ye Wang | | | | 10/13/2010 | $15 - 24k | | |
| Zhong Wen Zhang | X | X | AutoChina | 11/9/2010 | $50 - 99k | 216 Hong Qi St | 216 Hong Qi St |
| Li Xin Ma | X | X | AutoChina | 11/10/2010 | $50 - 99k | | 216 Hong Qi St |
| Hui Kai Yan | X | X | AutoChina | 11/8/2010 | $50 - 99k | | AutoChina Offices |
| Yong Li Li | X | X | | 11/9/2010 | $25 - 49k | | 216 Hong Qi St |
| Shu Ling Li | X | X | AutoChina | 11/8/2010 | $50 - 99k | | AutoChina Offices |

(A) The E*Trade Account applications listed different apartment numbers, but the same building as a home or mailing address:
216 Hong Qi Street, Qiaoxi District, China, Shijiazhuang, Hebei 050000.

## D.  Trading in the E*Trade Accounts.

64.     During the period November 2010 to February 2011 Defendants and the related E*Trade Accounts bought and sold millions of shares of AutoChina stock.

65.     In many cases, Defendants used the same computers and computer networks to affect their trades.  As more fully described below, many of these trades were coordinated between Defendants buying and selling AutoChina stock.

66.     For example, during the period between November 2010 and February 2011, the E*Trade accounts of Victory First, Rainbow Yield, Ye Wang, Hui Kai Yan, and Shu Ling Li were accessed at least once using an internet protocol address ("IP address") assigned to Kaiyuan Real Estate, an entity owned by AutoChina's Chairman that shares a business address with AutoChina.  In addition, seven other E*Trade Accounts used this IP address to trade AutoChina stock.

67.     An IP address is a unique numerical label assigned to each participant in a computer network.  Thus, an IP address indicates a connection to the internet.  An IP address could represent a single computer (e.g., a home computer) or an entire network of computers.

68.     Many of the E*Trade Accounts shared common browser cookies for their AutoChina trading on at least one occasion, which indicates that the same computer was used to effect the trades.  For example, Rui Ge Dong, Rainbow Yield, Yong Qi Li, Ai Xi Ji, Li Xin Ma and Yong Li Li used the same browser cookie when logging into their E*Trade accounts on at least one occasion.  In addition, two other E*Trade Accounts used this same browser cookie to trade AutoChina stock on at least one occasion.

69.     A browser cookie is a unique message passed from a web server (on the internet) to a web browser (on a computer) that is then stored on the computer's local hard drive.  The browser cookie allows web servers to identify who returns to the website.  Browser cookies allow websites to trace access from an individual computer.

70.     The Rainbow Yield account also shared a browser cookie on at least twenty different occasions with Hui Kai Yan and on more than one other occasion with Shu Ling Li. The Rainbow Yield account also used the same browser cookie as at least three other E*Trade Accounts.

**E.  Matched Orders and other Non-economic Trading.**

      **1.     Matched Orders.**

71.     A "matched order" is a coordinated  order for the purchase or sale of a security – that is, an order placed with the knowledge that another order (or orders) of substantially the same size, at substantially the same time, and at substantially the same price, has been or will be entered.  Beginning no later than December 2010 and continuing until at least February 2011, some or all of the E*Trade Account-holders, including some or all of the Defendants, were involved in placing matched orders for AutoChina stock on dozens of occasions.  In aggregate, the matched orders transferred hundreds of thousands of shares of AutoChina stock among

E*Trade Account-holders.  All of these were limit orders, and in many cases the buy and sell orders were placed less than one minute apart.

72.     The majority of the orders were placed for exactly the same share price.  For the remaining orders, the buy and sell order prices were within pennies of each other.

73.     The majority of the orders were for the exact same number of shares.

74.     For example, on January 12, 2011, Rui Ge Dong placed a buy order for 8,000 shares of AutoChina stock at a price of $26.25 per share at 3:38:09 p.m. EST.  At exactly the same time, Rainbow Yield (of which Shu Ling Li is the sole shareholder and director) placed a sell order for 8,000 shares of AutoChina stock at a price of $26.25 per share.  Rui Ge Dong also engaged in matched orders with approximately five other E*Trade Account-holders, including Victory First, Ye Wang, Zhong Wen Zhang, and Yong Qi Li.

75.     On January 20, 2011, in a four-minute time span, Rainbow Yield placed three separate sell orders for a total of  6,000 shares of AutoChina stock at $26.26 per share; during those same four minutes, Hui Kai Yan placed a buy order for 5,800 shares of AutoChina stock, also at $26.26 per share.  These January 20, 2011, trades by Rainbow Yield and Hui Kai Yan used the same browser cookie, indicating they were placed from the same computer.  Rainbow Yield also engaged in matched orders with approximately nine other E*Trade Account-holders, including  Rui Ge Dong, Victory First, Li Xin Ma, Ai Xi Ji, Zhong Wen Zhang, Yong Qi Li, Shu Ling Li, and Ye Wang.  Trading under her own account, Shu Ling Li engaged in a matched order with Rainbow Yield on January 26, 2011.

76.     On December 17, 2010, in a fifteen-minute time span, Victory First (of which Ye Wang is the sole director) placed two separate sell orders for a total of 30,000 shares of AutoChina stock at $24.99 per share; during those same fifteen minutes, Rui Ge Dong placed

two separate buy orders for a total of 26,000 shares at $25.00 per share.  Victory First also

engaged in matched orders with approximately two other E*Trade Account-holders, including

Rainbow Yield.

77.    On January 14, 2011, Yong Qi Li placed a buy order for 15,000 shares of

AutoChina stock at $26.20 per share.  At exactly the same time, Ai Xi Ji (believed to be his wife)

placed a sell order for 15,000 shares at $26.20 per share.  Yong Qi Li also engaged in matched

orders with approximately four other E*Trade Account-holders, including Zhong Wen Zhang,

Rainbow Yield, Li Xin Ma, and Rui Ge Dong.

78.     On January 6, 2011, Ye Wang placed a sell order for 7,985 shares of AutoChina

stock at $26.25 per share.  Just over a minute later, Rui Ge Dong placed a buy order for 6,000

shares at $26.26 per share.  Ye Wang (trading through the Victory First account) also engaged in

matched orders with other E*Trade Account-holders, including Rainbow Yield.

79.    On January 26, 2011, Ai Xi Ji placed a buy order for 6,000 shares of AutoChina

stock at $27.29 per share.  At exactly the same time, Li Xin Ma placed a sell order for 6,000

shares at $27.28 per share.  Ai Xi Ji also engaged in matched orders with approximately three

other E*Trade Account-holders, including Rainbow Yield and Yong Qi Li.

80.    In addition to the trade described in the preceding paragraph, Li Xin Ma also

engaged in matched orders with approximately two other E*Trade Account-holders, including

Rainbow Yield  and Yong Qi Li.

81.    On January 27, 2011, Zhong Wen Zhang placed a buy order for 2,000 shares of

AutoChina stock at $27.58 per share.  Just over a minute later, Rainbow Yield placed a sell order

for 2,000 shares at $27.58 per share.  On at least a few additional occasions, Zhong Wen Zhang

either bought or sold approximately the same amount of shares on the same day as Yong Qi Li, Rue Ge Dong, or Rainbow Yield.

82.     Table 2 sets out the allegations described above in table form.

**Table 2: Examples of Matched Orders**

| Date | Time | Buy | | | | | Sell | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Account | Order Price | Order Qty | Fill Qty | Fill Price | Account | Order Price | Order Qty | Fill Qty | Fill Price |
| 1/12/2011 | 3:38:09 PM | RUI GE DONG | $26.25 | 8,000 | 8,000 | $26.25 | | | | | |
| 1/12/2011 | 3:38:09 PM | | | | | | RAINBOW YIELD LIMITED | $26.25 | 8,000 | 6,200 | $26.25 |
| | | | | | | | | | | | |
| 1/20/2011 | 12:12:34 PM | | | | | | RAINBOW YIELD LIMITED | $26.26 | 1,000 | 1,000 | $26.26 |
| 1/20/2011 | 12:13:21 PM | | | | | | RAINBOW YIELD LIMITED | $26.26 | 4,000 | 4,000 | $26.26 |
| 1/20/2011 | 12:15:21 PM | HUI KAI YAN | $26.26 | 5,800 | 5,800 | $26.26 | | | | | |
| 1/20/2011 | 12:15:53 PM | | | | | | RAINBOW YIELD LIMITED | $26.26 | 1,000 | 1,000 | $26.26 |
| | | | | | | | | | | | |
| 12/17/2010 | 9:48:49 AM | | | | | | VICTORY FIRST LIMITED | $24.99 | 12,000 | 12,000 | $24.99 |
| 12/17/2010 | 9:53:29 AM | RUI GE DONG | $25.00 | 12,000 | 12,000 | $24.99 | | | | | |
| 12/17/2010 | 9:59:26 AM | | | | | | VICTORY FIRST LIMITED | $24.99 | 18,000 | 18,000 | $24.99 |
| 12/17/2010 | 10:03:51 AM | RUI GE DONG | $25.00 | 14,000 | 14,000 | $24.99 | | | | | |
| | | | | | | | | | | | |
| 1/14/2011 | 11:28:59 AM | YONG QI LI | $26.20 | 15,000 | 15,000 | $26.20 | | | | | |
| 1/14/2011 | 11:28:59 AM | | | | | | AI XI JI | $26.20 | 15,000 | 15,000 | $26.20 |
| | | | | | | | | | | | |
| 1/6/2011 | 12:41:06 PM | | | | | | YE WANG | $26.25 | 7,985 | 7,985 | $26.26 |
| 1/6/2011 | 12:42:08 PM | RUI GE DONG | $26.26 | 6,000 | 6,000 | $26.26 | | | | | |
| | | | | | | | | | | | |
| 1/26/2011 | 9:39:09 AM | AI XI JI | $27.29 | 6,000 | 6,000 | $27.29 | | | | | |
| 1/26/2011 | 9:39:09 AM | | | | | | LI XIN MA | $27.28 | 6,000 | 6,000 | $27.29 |
| | | | | | | | | | | | |
| 1/26/2011 | 2:13:24 PM | | | | | | SHU LING LI | $27.48 | 2,780 | 2,780 | $27.48 |
| 1/26/2011 | 3:31:26 PM | RAINBOW YIELD LIMITED | $27.48 | 3,000 | 3,000 | $27.31 | | | | | |
| | | | | | | | | | | | |
| 1/27/2011 | 10:06:07 AM | ZHONG WEN ZHANG | $27.58 | 2,000 | 2,000 | $27.58 | | | | | |
| 1/27/2011 | 10:07:18 AM | | | | | | RAINBOW YIELD LIMITED | $27.58 | 2,000 | 2,000 | $27.58 |

### 2.     Other Non-economic trading.

83.     The manipulative scheme also involved wash trades (trades where there was no change in beneficial ownership), and other trading for which there was no economic rationale. The only purpose for this trading was to further the manipulation of AutoChina's trading volume and stock price.

84.     For example, on January 6, 2011, Ye Wang placed a buy order for 5,000 shares of AutoChina stock at $25.99 per share.  Approximately six minutes later, Victory First (of which Ye Wang is the sole shareholder and director) placed a sell order for 3,150 shares at $25.99 per share.  Both trades were placed by a computer using the same browser cookie.  This trade resulted in no change of beneficial ownership.

85.     Also on January 6, 2011, within an hour of the earlier trade, Ye Wang again placed a buy order, this time for 7,550 shares of AutoChina stock at a price of $26.04.  Within five minutes, Victory First placed a sell order for 8,120 shares at a price of $26.04.  Both of these trades were made by a computer using the same browser cookie as the trades noted in the preceding paragraph.  These trades did not result in a change in beneficial ownership.

86.     On January 27, 2011, Rainbow Yield placed a buy order for 2,000 shares of AutoChina stock at $27.75 per share.  Within a minute, Rainbow Yield placed a sell order for 1,000 shares at $27.77 per share.  Within the next minute, Rainbow Yield placed a second sell order, also for 1,000 shares, also at $27.77 per share.  All three of these trades were made by a computer using the same browser cookie.  These trades did not result in any change in beneficial ownership.

87.     Throughout the day on January 27, 2011, Rainbow Yield continued to place additional buy and sell orders within minutes of each other.

88.     On January 20, 2011, between 10:57 and 11:03 a.m., Rainbow Yield placed buy orders for 4,000 shares of AutoChina stock.   These shares were purchased for $26.25 per share (2,000 shares) and $26.26 per share (2,000 shares).  Between 12:06 and 12:10 p.m., Rainbow Yield placed sell orders for a total of 2,500 shares.   These shares were sold for $26.25 per share (1,500 shares) and $26.28 per share (1,000 shares).

89.     On January 28, 2011, Yong Qi Li placed an order to buy 3,000 shares of AutoChina stock at $27.56 per share.  Within one minute, he placed an order to sell 1,000 shares, also at $27.56 per share.  Less than a minute later, he placed an order to sell another 1,000, also at $27.56 per share.  These orders resulted in his selling 500 shares of AutoChina stock at $27.56 per share and buying 2,000 shares of AutoChina stock at $27.56 per share.

90.    On January 28, 2011, Rainbow Yield placed a buy order for 2,000 shares of AutoChina stock at $27.68 per share.  Within three minutes, Rainbow Yield placed a sell order for 1,000 shares at $27.68 per share.  These orders resulted in Rainbow Yield's buying 2,000 shares at $27.68 per share and selling 1,000 shares at $27.69 per share.

91.    On February 1, 2011, Rainbow Yield placed a sell order for 1,000 shares of AutoChina stock at $28.21 per share.  Within a minute, Rainbow Yield placed a buy order for 3,000 shares at $28.20 per share.  Approximately two minutes later, Rainbow Yield placed a sell order for 1,000 shares at $28.21 per share.  All of these trades were executed at the order price.

92.    In addition to the trades between E*Trade Accounts, there were non-economic trades between E*Trade and Polaris accounts held by the same defendant.

93.    For example, on December 10, 2010, beginning at or about 9:30 in the morning, Rui Ge Dong (through her E*Trade account) placed a series of buy orders for AutoChina stock, all at $25.00 per share, for a total of 104,000 shares.  That same day, Rui Ge Dong (through her Polaris account) placed one or more sell orders and sold 96,200 shares at $25.00 per share.

94.    On December 16, 2010, Zhong Wen Zhang placed a buy order in his E*Trade account for 41,000 shares of AutoChina stock at $25.00 per share.  That same day, he placed a sell order through his Polaris account and sold 20,000 shares at $25.00 per share.

95.    The trades described above, as well as others like them, were designed to create the false appearance of an active and stable market in AutoChina stock.

96.    By engaging in these matched orders and other non-economic trading (including wash trades), the defendants compromised the integrity of the market by creating the appearance of genuine trading activity in AutoChina stock.

### 3.    **Volume**.

97.    The Defendants' activity caused a dramatic increase in the trading volume of AutoChina stock and created the artificial appearance of an actively traded stock.   Between June and October 31, 2010 (prior to the opening of all but one of the E*Trade accounts), the average daily trading volume for AutoChina stock was approximately 18,000 shares per day.  During the period November 1, 2010 through January 31, 2011, the average daily trading volume increased to over 139,000 shares per day, and Massachusetts investors traded in AutoChina stock.

98.    For the period November 2010 through January 2011, the Defendants purchased over four million shares of AutoChina stock and sold over three million shares, excluding margin sales.  This trading represented a substantial percentage of the trading in AutoChina stock during this time period.  Trading by the Defendants accounted for over 45% of buying and over 15% of selling of AutoChina stock in November 2010; over 40% of buying and over 35% of selling in December 2010; and over 50% of buying and over 40% of selling in January 2011.  When combined, trading by all of the E*Trade Accounts accounted for over 45% of buying and over 20% of selling of AutoChina stock November 2010; over 50% of buying and over 40% of selling in December 2010; and over 50% of buying and over 40% of selling in January 2011.

99.    The Defendants participated in this manipulative trading as follows:  From November 2010 through January 2011, Rui Ge Dong bought over 900,000 shares of AutoChina stock and sold over 600,000 shares.

100.    From November 2010 through January 2011, Victory First bought over 700,000 shares of AutoChina stock and sold over 100,000 shares.

101.    From November 2010 through January 2011, Rainbow Yield bought over 700,000 shares of AutoChina stock and sold over 1 million shares.

102.    From November 2010 through January 2011, Yong Qi Li bought over 400,000 shares of AutoChina stock and sold over 300,000 shares.

103.    From November 2010 through January 2011, Ai Xi Ji bought over 200,000 shares of AutoChina stock and sold over 200,000 shares.

104.    From November 2010 through January 2011, Ye Wang bought over 200,000 shares of AutoChina stock and sold over 100,000 shares.

105.    From November 2010 through January 2011, Zhong Wen Zhang bought over 200,000 shares of AutoChina stock and sold over 200,000 shares.

106.    From November 2010 through January 2011, Li Xin Ma bought over 100,000 shares of AutoChina stock and sold over 100,000 shares.

107.    From November 2010 through January 2011, Hui Kai Yan bought over 50,000 shares of AutoChina stock.

108.    From November 2010 through January 2011, Yong Li Li bought over 50,000 shares of AutoChina stock and sold over 40,000 shares.

109.    From November 2010 through January 2011, Shu Ling Li bought over 60,000 shares of AutoChina stock and sold over 40,000 shares.

110.    By making many trades at coordinated prices, the Defendants misrepresented the market price of the shares to the investing public in that, for much of the period of November 2010 through January 2011, the Defendants accounted for the majority of the market in AutoChina stock.

111.    Defendants' trades also misrepresented the liquidity of the shares to the investing public by dramatically increasing daily and monthly trading volume beyond the naturally occurring market level.

112.    On February 1, 2011, when an online blogger posted a critical report about AutoChina, the market responded by heavily selling AutoChina stock.  On that day, the E*Trade Account-holders (including the Defendants) were net buyers of AutoChina in the amount of approximately 275,000 shares – the highest single daily total during the relevant period.  In addition to the trading through their E*Trade Accounts, the Defendants purchased approximately 90,000 shares of AutoChina stock through their Polaris accounts on February 1, 2011.

### 4.    Closing of Accounts and Retention of Financing.

113.    The Defendants' scheme to create artificial trading volume in AutoChina stock appears to have ended in or about February 2011.

114.    On or about February 16, 2011, AutoChina's CFO circulated an email urging Defendant Hui Kai Yan and others to "stop shopping for a stock loan immediately" because "our constant shopping may be contributing to our share price decline."

115.    An entity controlled by AutoChina's Chairman and his spouse obtained approximately $120 million in financing in or about February and March 2011.  The entity's sole asset was AutoChina's stock.  The entity subsequently transferred at least $60 million of the loan proceeds to AutoChina.

116.    E*Trade closed many of the Defendants' accounts in or about March 2011 after making efforts to verify the account activity.

117.    The period in which the Defendants' trades abated, beginning in February 2011 and continuing until April 2011, coincided with a dramatic decrease in the average daily volume of AutoChina stock.  For example, the average daily trading volume of AutoChina stock declined to approximately 44,000 shares per day for the month of April 2011 – a sharp contrast from the average daily trading volume created by the Defendants' activity in the previous months.  The

average daily trading volume further declined to approximately 11,000 shares per day for the month of May 2011.

## First Claim for Relief
### (Violation of Section 17(a) of Securities Act By Defendants)

118.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 117 above as if set forth fully herein.

119.    By reason of the foregoing, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities:  (a) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

120.    By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## Second Claim for Relief
### (Violation of Section 10(b) of Exchange Act and Rule 10b-5 By Defendants)

121.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 117 above as if set forth fully herein.

122.    By reason of the foregoing, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material fact(s) necessary to make the statements made not misleading; or (c)

have engaged or are engaging in acts, practices, or courses of business which operate as a fraud

or deceit upon certain persons.

123.    By engaging in the conduct described above, Defendants have violated, and

unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### Third Claim for Relief
### (Violations of Section 9(a) of the Exchange Act)

124.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 117 above as if set forth fully herein.

125.    By reason of the foregoing, Defendants directly or indirectly, acting intentionally,

knowingly or recklessly, in connection with the purchase or sale of securities, by use of the

means or instrumentalities of interstate commerce or the facilities of a national securities

exchange or the mail: (1) for the purposes of creating a false or misleading appearance of active

trading in any security registered on a national exchange, or a false or misleading appearance

with respect to the market for such security, (A) effected transactions in such security which

involves no change in the beneficial ownership thereof, or (B) entered an order or orders for the

purchase of such security with the knowledge that an order or orders of substantially the same

size, at substantially the same time, and at substantially the same price, for the sale of any such

security, has been or will be entered by or for the same or different parties; or (C) entered an

order or orders for the sale of any such security with the knowledge that an order or orders of

substantially the same size, at substantially the same time, and at substantially the same price, for

the purchase of such security, has been or will be entered by or for the same or different parties;

and/or (2) effected, alone or with one or more persons, a series of transactions in securities

registered on a national exchange, creating actual or apparent active trading in such securities, or

raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others.

126.     By engaging in the conduct described above, Defendants violated Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

**Fourth Claim for Relief**
**(Aiding and Abetting AutoChina's Violations of Section 17(a)**
**of the Securities Act)**

127.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 117 above as if set forth fully herein.

128.     By reason of the foregoing, Defendant AutoChina, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities:  (a) has employed or is employing devices, schemes, or artifices to defraud; or (b) has engaged or is engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

129.     Defendants Rui Ge Dong; Victory First; Rainbow Yield; Yong Qi Li; Ai Xi Ji; Ye Wang; Zhong Wen Zhang; Li Xin Ma; Yong Li Li; and Shu Ling Li each knowingly or recklessly provided substantial assistance to Defendant AutoChina's violations of Section 17(a) of the Securities Act.

130.     By reason of the foregoing, Defendants Rui Ge Dong;  Victory First; Rainbow Yield; Yong Qi Li; Ai Xi Ji; Ye Wang; Zhong Wen Zhang; Li Xin Ma; Yong Li Li; and Shu Ling Li each aided and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**Fifth Claim for Relief**
**(Aiding and Abetting AutoChina's Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 thereunder)**

131.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 117 above as if set forth fully herein.

132.    By reason of the foregoing, Defendant AutoChina, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) has employed or are employing devices, schemes, or artifices to defraud; (b) has made or are making untrue statements of material fact or have omitted or are omitting to state material fact(s) necessary to make the statements made not misleading; or (c) has engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

133.    Defendants Rui Ge Dong; Victory First; Rainbow Yield; Yong Qi Li; Ai Xi Ji; Ye Wang; Zhong Wen Zhang; Li Xin Ma; Yong Li Li; and Shu Ling Li each knowingly or recklessly provided substantial assistance to AutoChina's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

134.    By reason of the foregoing, Defendants Rui Ge Dong; Victory First Rainbow Yield; Yong Qi Li; Ai Xi Ji; Ye Wang; Zhong Wen Zhang; Li Xin Ma; Yong Li Li; and Shu Ling Li each aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

**Sixth Claim for Relief**
**(Aiding and Abetting AutoChina's Violations of Section 9(a) of the Exchange Act)**

135.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 117 above as if set forth fully herein.

136.     By reason of the foregoing, Defendant AutoChina, directly or indirectly, acting

intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by

use of the means or instrumentalities of interstate commerce or the facilities of a national

securities exchange or the mail: (1) for the purposes of creating a false or misleading appearance

of active trading in any security registered on a national exchange, or a false or misleading

appearance with respect to the market for such security, (A) effected transactions in such security

which involves no change in the beneficial ownership thereof, or (B) entered an order or orders

for the purchase of such security with the knowledge that an order or orders of substantially the

same size, at substantially the same time, and at substantially the same price, for the sale of any

such security, has been or will be entered by or for the same or different parties; or (C) entered

an order or orders for the sale of any such security with the knowledge that an order or orders of

substantially the same size, at substantially the same time, and at substantially the same price, for

the purchase of such security, has been or will be entered by or for the same or different parties;

and/or (2)  effected, alone or with one or more persons, a series of transactions in securities

registered on a national exchange, creating actual or apparent active trading in such securities, or

raising or depressing the price of such securities, for the purpose of inducing the purchase or sale

of such securities by others.

137.     Defendants Rui Ge Dong; Victory First, Limited; Rainbow Yield, Limited; Yong

Qi Li; Ai Xi Ji; Ye Wang; Zhong Wen Zhang; Li Xin Ma; Yong Li Li; and Shu Ling Li each

knowingly or recklessly provided substantial assistance to AutoChina's violations of Section 9(a)

of the Exchange Act.

138.     By reason of the foregoing, Defendants Rui Ge Dong; Victory First; Rainbow

Yield; Yong Qi Li; Ai Xi Ji; Ye Wang; Zhong Wen Zhang; Li Xin Ma; Yong Li Li; and Shu

Ling Li each aided and abetted violation of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter a permanent injunctions restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)];

B.      Require Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest;

C.      Require Defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; Section 21(d)(3) of the Securities Exchange Act [15 U.S.C. § 78u(d)(3)];

D.      Impose an officer and director bar against Hui Kai Yan pursuant to Section 21(d)(2) of the Exchange Age [15 U.S.C. § 78u(d)(4)] ;

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

/s/ Rachel E. Hershfang
Rachel E. Hershfang (Mass. Bar No. 631898)
John J. Kaleba (IL Bar No. 6270032)
Eric A. Forni  (Mass. Bar No. 669685)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8987 (Hershfang direct)
Facsimile:  (617) 573-4590
E-mail:  HershfangR@sec.gov

Dated:  July 6, 2012

CERTIFICATE OF SERVICE

I certify that this document filed through the Court's Electronic Case Filing (ECF) system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Rachel E. Hershfang
Rachel E. Hershfang